**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq. (msirota@coleschotz.com)
Felice R. Yudkin, Esq. (fyudkin@coleschotz.com)
Jacob S. Frumkin, Esq. (jfrumkin@coleschotz.com)
Matteo Percontino (mpercontino@coleschotz.com)
Rebecca W. Hollander (rhollander@coleschotz.com)

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>CHRISTOPHER & BANKS CORPORATION, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 21-_____ (___)<br><br>Joint Administration Requested |

**DECLARATION OF KERI L. JONES IN SUPPORT OF DEBTORS'**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Keri L. Jones, make this declaration under 28 U.S.C. § 1746:

1.     I am a member of the board of directors and the President and Chief Executive

Officer of Christopher & Banks Corporation ("**CB Corp.**")  and its subsidiaries, the debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), and

have served in that capacity since March 12, 2018.  I have over thirty (30) years of experience in

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: Christopher & Banks Corporation (5422), Christopher & Banks, Inc. (1237), and Christopher & Banks Company (2506).  The Debtors' corporate headquarters is located at 2400 Xenium Lane North, Plymouth, Minnesota 55441.

the retail industry.  From May 2017 until February 2018, I served as Executive Vice President,

Chief Merchant of Dick's Sporting Goods.  Before my tenure at Dicks Sporting Goods, I spent

twenty-seven (27) years at Target Corporation, serving in a variety of leadership roles, including

as Executive Vice President, Global Supply Chain (from 2015 to 2016), Executive Vice

President, Merchandise Planning and Operations (from 2014 to 2015), Senior Vice President,

Merchandise Planning (from 2011 to 2014), Senior Vice President, Health and Beauty (from

2008 to 2011) and Vice President, General Merchandise Manager, Toys and Sporting Goods

(from 2001 to 2008).

2.    I am familiar with the Debtors' day-to-day operations, business and financial

affairs, books and records, and the circumstances leading to the commencement of the Debtors'

chapter 11 cases (the "**Chapter 11 Cases**").

3.    On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary

petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy

Code**") with the United States Bankruptcy Court for the District of New Jersey (the "**Court**").

The Debtors continue to operate their business and manage their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.    To enable the Debtors to operate effectively and minimize potential adverse

effects in the Chapter 11 Cases, the Debtors have requested certain relief in "first day" motions

and applications filed with the Court (collectively, the "**First Day Motions**") concurrently

herewith.  The First Day Motions, summarized below, seek, among other things, to (a) allow the

Debtors to continue using cash collateral to fund an orderly liquidation of the Debtors' assets, (b)

ensure the continuation of the Debtors' cash management system and other business operations

without interruption, (c) preserve the Debtors' valuable relationships with suppliers, vendors,

customers, and other interested parties, (d) maintain employee morale and confidence, and (e) implement certain administrative procedures that will promote a seamless transition into chapter 11. This relief is critical to the Debtors' efforts to maximize the value of their assets for the benefit of all stakeholders.

5. This Declaration is submitted in support of the First Day Motions. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' employees, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and the retail industry. I am authorized to submit this Declaration on the Debtors' behalf. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

6. This Declaration is intended to provide a summary overview of the Debtors' businesses and the need for their restructuring pursuant to chapter 11 of the Bankruptcy Code. Sections I and II provide a brief overview of the Debtors' businesses and the Debtors' contemplated course of action. Section III describes the Debtors' pre-petition capital structure. Section IV describes the circumstances that precipitated the commencement of the Chapter 11 Cases and the Debtors' objectives in the Chapter 11 Cases. Section V provides a summary of the First Day Motions and the factual bases for the relief requested therein.

## I.    **PRELIMINARY STATEMENT**

7. The Debtors are a national specialty retailer featuring exclusively designed, privately-branded women's apparel and accessories at a good value. The Debtors operate 449 retail stores in 44 states as well as a substantial and growing eCommerce business.

61893/0001-21908209v4

8.     The Debtors are the latest victims of the retail apocalypse that was first created by a customer migration away from brick-and-mortar stores and most recently, the COVID-19 pandemic.  The COVID-19 pandemic was the proverbial "nail in the coffin" for the Debtors following years of adverse market trends, including the shifting of sales from traditional brick-and-mortar retailers to online sellers, increased competition from big-box retailers, and changing consumer preferences.

9.     To combat the rapid spread of COVID-19 and in response to government stay-at-home orders, the Debtors were forced to temporarily close their retail stores and corporate office effective as of March 19, 2020.  All of the Debtors' stores remained closed until April 27, 2020, when a small number of select stores were reopened to serve solely as fulfillment centers for the Debtors' eCommerce sales.  While the majority of the Debtors' stores, as well as their distribution center, have reopened to customers, the COVID-19 pandemic has caused significant disruption to the Debtors' business and has had a significant adverse impact on their financial condition, results of operations and cash flows, both for the periods of time when stores were temporarily closed as well as continued suppressed traffic and customer spending at the Debtors' stores.

10.     Given the Debtors' liquidity constraints, they worked diligently to solicit and develop strategic alternatives to maximize value for the benefit of all stakeholders.  To assist in the Debtors' efforts to increase liquidity and explore alternative sources of financing, in early November of 2020, the Debtors engaged Berkeley Research Group, LLC ("**BRG**"), as financial advisor, and B. Riley Securities, Inc. ("**B. Riley**"), as investment banker.   In the months leading to the Petition Date, the Debtors took steps to increase liquidity by negotiating lease concessions and deferrals and reducing operating and capital expenditures.  Additionally, the Debtors

4

explored sources of additional financing through a refinancing of the Debtors' debt and a private restructuring of their debt and liabilities.  Unfortunately, given the Debtors' continued operating losses, decline in sales and the limited runway, the Debtors were unable to execute on any out-of-court solution for their liquidity constraints.

11.    In a volatile retail climate that has seen numerous casualties since the COVID-19 outbreak, the Debtors commenced these Chapter 11 Cases to preserve value for the benefit of the Debtors' stakeholders.  The Debtors determined that filing for Chapter 11 protection, utilizing cash collateral (with the consent of their lenders) and pursuing an orderly liquidation of their assets in a controlled, court-supervised environment is the best available option to maximize value for the benefit of all stakeholders.

12.    Based on market feedback, the Debtors, in consultation with their advisors, have determined that a sale of any traditional brick-and-mortar business is not viable or achievable under the current circumstances.  The sale of the Debtors' eCommerce business, however, has and continues to represent an attractive asset for buyers.  Accordingly, the Debtors plan to pursue "going out of business" ("**GOB**") sales for their store fleet.  To that end, before the Petition Date, the Debtors engaged Hilco Merchant Resources, LLC ("**Hilco**") to liquidate the inventory in their 449 retail stores

13.    While the Debtors are liquidating their inventory, the Debtors, with the assistance of B. Riley, plan to continue to market and ultimately sell the eCommerce business under Section 363 of the Bankruptcy Code.  The Debtors believe and respectfully submit that a dual track process - - that is, an orderly liquidation of their store inventory through GOB sales and a going concern sale of the eCommerce business to the Stalking Horse Bidder (or successful bidder) - - maximizes the value of the Debtors' assets and the recovery to creditors.

61893/0001-21908209v4

## II.      THE DEBTORS' BUSINESS

### A.      Corporate Structure

14.      Debtor CB Corp. was incorporated in 1986 to acquire Braun's Fashions, Inc., which had operated a family-owned business since 1956.  In 1992, CB Corp. became a publicly traded corporation.  On April 17, 2019, CB Corp. received notice from the New York Stock Exchange ("**NYSE**") informing it that the NYSE had determined to suspend trading of and to commence proceedings to delist the company's common stock from NYSE because it had fallen below the NYSE's continued listing standard that requires average market capitalization of at least $15.0 million over thirty (30) consecutive trading days.  Since April 2019, shares of CB Corp.'s common stock have been trading on OTCQX, operated by the OTC Markets Group, under the symbol "CBKC."

15.      CB Corp. owns all of equity in its direct subsidiary Christopher & Banks, Inc. ("**CB Inc.**").  CB Inc., in turn, owns all of the equity in its direct subsidiary Christopher & Banks, Company ("**CB Company**").  An organizational chart illustrating the corporate structure of the Debtors is attached hereto as **Exhibit A**.

16.      As of the Petition Date, the Board of Directors of CB Corp. (the "**Board**") is composed of myself, Jonathan Duskin, Seth Johnson, Kent Kleeberger, William F. Sharpe III and Allison Wing.

### B.      General Overview of the Debtors' Business Operations

17.      Based in Plymouth, Minnesota, the Debtors are a value-priced retailer of women's specialty apparel that cater to women in missy, petite and plus sizes.  The Debtors' merchandise includes exclusive designs of women's apparel, generally consisting of casual clothing, everyday basics, wear-to-work, leisure/activewear and seasonal sleepwear.  The Debtors also offer a selection of jewelry and accessories to complement their customer's wardrobe.

61893/0001-21908209v4

18.     The Debtors operate an integrated, omni-channel business platform that is designed to provide customers a seamless retail experience with the ability to shop when and where they want, including their retail stores, outlet stores and website.  The Debtors' 449 retail stores, which are operated by Debtor CB Inc., are located throughout the United States, primarily in smaller markets with populations of less than 75,000 people.



19.     The Debtors' brick and mortar stores consist of (i) 31 Christopher & Banks stores, offering merchandise assortments in women's apparel and accessories for missy (sizes 4 to 16) and petite (sizes 4P to 16P), (ii) 28 C.J. Banks stores, offering merchandise assortments in similar women's apparel and accessories for plus-size women (sizes 14W to 26W) and (iii) 314 Missy, Petite, Women ("**MPW**") and 76 outlet stores, offering merchandise assortments from both Christopher & Banks and C.J. Banks in all three size ranges in a single location.  As of the Petition Date, approximately 86% of the Debtors' stores (including outlets) are in the MPW format.

  

7

20.     Additionally, the Debtors' website (www.christopherandbanks.com) provides customers the ability to browse the Debtors' offerings, locate stores and order merchandise online.  The Debtors' online merchandise consists of the assortment that is carried in the stores along with some online exclusives that are primarily size and color extensions of the store assortment.

21.     All of the Debtors' operations are located in the United States.  CB Corp. performs the administrative and executive functions on behalf of the Debtors' enterprise. Merchandise selection, pricing and promotions, procurement and sourcing, marketing and advertising are managed at the Debtors' corporate headquarters in Plymouth, Minnesota and largely conducted by Debtor CB Company.  The Debtors' functional support capabilities including, among others, human resources, finance and legal are also performed at the corporate headquarters.  The Debtors have field operations that support their retail teams in their brick and mortar stores.

22.     The Debtors utilize a broad base of manufacturers located primarily in China, Cambodia, Indonesia and Vietnam along with some domestic manufacturing.  For the fiscal year ending February 1, 2020, the Debtors' ten (10) largest suppliers accounted for 66% of the merchandise they purchased.

**C.      The Debtors' Real Property and Personal Property Lease Obligations**

23.     The Debtors lease retail business locations, office facilities, office equipment, and automotive equipment under various non-cancelable operating leases.  The Debtors' stores are located primarily in shopping malls and retail centers in smaller to mid-sized cities and suburban areas.  Leases on retail business locations typically specify minimum rentals plus common area maintenance charges, real estate taxes, other landlord charges and possible additional rentals based upon a percentage of sales.

8

24.     On April 27, 2018, the Debtors completed the sale of and entered into an agreement to leaseback its corporate headquarters facility, including the distribution center in Plymouth, Minnesota.  The agreement provided for the sale of the headquarters facility for a purchase price of $13.7 million and the subsequent leaseback for a 15-year term.

## D.     **Distribution and Logistics**

25.     The Debtors distribute most of their products that are sold in their stores and online from their distribution center located in Plymouth, Minnesota.  Historically, new merchandise was generally received each weekday at the corporate distribution center.  After arrival, merchandise is sorted and packaged for shipment to individual stores or to the Debtors' third-party eCommerce fulfillment center or is held for future store or eCommerce replenishment.  Merchandise is typically shipped to the Debtors' stores via third-party delivery services multiple times per week, providing the stores with a steady flow of inventory.  Merchandise sold through the Debtors' eCommerce channel is fulfilled directly to the customer either through their third-party service provider or from one of the Debtors' retail stores.

## E.     **The Debtors' Employees**

26.     As of the Petition Date, the Debtors employ approximately 2,991 employees, including approximately 1,044 full-time salaried employees and 1,947 hourly employees (collectively, the "**Employees**").  In broad terms, the Debtors' workforce is comprised of (i) in-store Employees, including, store managers and associates and other employees that work at the Debtors' various store locations; (ii) Employees that work at the Debtors' corporate headquarters, including corporate and senior level employees; and (iii) Employees in the Debtors' distribution center.

61893/0001-21908209v4

**F.**    **The Debtors' Recent Financial Performance**

27.    For the third quarter of the Debtors' fiscal year ending October 31, 2020, the

Debtors had net sales of $72,927,000 and suffered operating losses of $10,547,000.

28.    As of December 31, 2020, the Debtors' balance sheet reflects consolidated assets

of approximately $166 million and consolidated liabilities of approximately $105 million.

**G.**    **The Debtors' Operational Initiatives**

29.    Before the COVID-19 pandemic, the Debtors began to implement a turnaround

plan and a number of performance improvement initiatives to build sustainable long-term

revenue growth and consistent profitability. The strategic initiatives focused on (i) enhancing the

customer shopping experience, (ii) improving marketing and promotional efficiencies, (iii)

expanding omni-channel capabilities, (iv) building customer loyalty and growing the Debtors'

customer base and (iv) reducing operating expenses.

30.    Beginning in late 2018, the Debtors expanded their omni-channel capabilities by

offering "Buy online, ship to store" and "Buy online, ship from store" options on the Debtors'

website and having retail locations fulfill eCommerce orders.  In 2019, the Debtors further

expanded their omni-channel capabilities by offering "Buy online, pick up in store."  Those

fulfillment options enabled the Debtors to better leverage their inventory across the entire chain.

31.    Additionally, during the 2019 fiscal year, the Debtors engaged a national third-

party real estate consulting firm to assist in lease restructuring and to accelerate and increase

occupancy cost savings.  The Debtors also hired a third-party non-merchandise procurement

specialist to assist them in analyzing relationships and negotiating cost reductions.

32.    While the Debtors' operational initiatives were starting to have a positive impact

on their financial performance, as set forth below, those efforts were hampered by the sudden

onset of COVID-19 pandemic.

## III.    CAPITAL STRUCTURE

### A.    Pre-Petition Secured Debt

33.    As described below in greater detail, the Debtors finance their business operations with three (3) forms of secured debt: (i) a revolving credit facility; (ii) a term loan and (iii) vendor financing.  Those loans are more particularly described below.

(a)    **The Pre-Petition Credit Agreements and the Intercreditor Agreement**

a.    The Revolving Loan

34.    The Debtors are borrowers under that certain Second Amended and Restated Credit Agreement dated July 12, 2012 (as amended, restated, supplemented, or otherwise modified prior to the Petition Date, the "**Prepetition ABL Credit Agreement**" and, collectively with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, or otherwise modified in accordance with the terms thereof, the "**Prepetition ABL Credit Documents**") by and among the Debtors and ReStore Capital, LLC ("**ReStore**"), in its capacity as lender and L/C Issuer (the "**Prepetition ABL Lender**")[2] pursuant to which Prepetition ABL Lender made revolving loans to the Debtors in an aggregate principal amount not to exceed $50,000,000, including a letter of credit sublimit of $17,500,000 (the "**Prepetition ABL Facility**").

35.    As security for the Debtors' obligations under the Prepetition ABL Credit Documents, the Debtors granted a first security interest to Prepetition ABL Lender in substantially all of their assets (the "**Prepetition ABL Priority Collateral**") and a second priority security interest in the "Term Priority Collateral" (the "**Prepetition Term Priority**

---

[2] Immediately before the Petition Date, the Prepetition ABL Credit Documents and the Prepetition ABL Facility were assigned by Wells Fargo Bank, National Association to ReStore.  All references to Prepetition ABL Lender herein shall be deemed to refer to ReStore.

**Collateral**, and together with the Prepetition ABL Priority Collateral, the "**Prepetition Collateral**").

36.     As of the Petition Date, there were no outstanding amount of "Loans" under the Prepetition ABL Facility and the aggregate undrawn amount of all outstanding "Letters of Credit" under the Prepetition ABL Facility was not less than $8.9 million.

b.     The Term Loan

37.     Separately, the Debtors are borrowers under that certain Term Loan and Guarantee Agreement dated as of February 27, 2020 (as amended, restated, supplemented, or otherwise modified prior to the Petition Date, the "**Prepetition Term Loan Agreement**" and, collectively with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, or otherwise modified in accordance with the terms thereof, the "**Prepetition Term Loan Credit Documents**") by and among the Debtors, ALCC, LLC,[3] as administrative agent and collateral agent and the lenders party thereto (the "**Prepetition Term Loan Lenders**" and together with Prepetition ABL Lender the "**Prepetition Lenders**"), pursuant to which the Prepetition Term Loan Lenders agreed to fund one or more loans to the Debtors in an aggregate principal amount not to exceed $10,000,000 (the "**Prepetition Term Loan Facility** ").

38.     As security for the Debtors' obligations under the Prepetition Term Loan Credit Documents, the Debtors granted a security interest to the Prepetition Term Loan Lenders in substantially all of their assets including first priority security interests in the Prepetition Term Priority Collateral and second priority security interests in the Prepetition ABL Priority Collateral.

---

[3] ALCC, LLC is an affiliate of ReStore and Hilco.

12

39.      As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Term Loan Facility was not less than $5,100,000.

c.      The Intercreditor Agreement[4]

40.      The Debtors, the Prepetition ABL Lender, and the Prepetition Term Lenders are subject to an Intercreditor Agreement dated February 27, 2020 (the "**Intercreditor Agreement**") that confirms the relative rights, priorities, and preferences if the Prepetition ABL Lender and Prepetition Term Lenders in the assets and properties of the Debtors. Critically, and as set forth in more detail in the Intercreditor Agreement, the Prepetition ABL Lender possesses first-priority liens on the Prepetition Collateral, with the exception of certain "Term Priority Collateral," consisting of "Intellectual Property" and proceeds thereof.

(b)      <b>The Secured Vendor Financing Program</b>

41.      On August 5, 2020, Debtor CB Company entered into a secured vendor program agreement (the "**Vendor Program Agreement**") with ALCC, LLC (the "**Vendor Agent**").  Under the Program Agreement, the Vendor Agent may purchase up to $10,000,000 of inventory from CB Company's vendors (the "**Program Inventory**") to be resold to CB Company.  To secure the repayment of CB Company's obligations under the Vendor Program Agreement, CB Company granted the Vendor Agent a valid and continuing purchase-money security interest in all Program Inventory.  The Vendor Program obligations constitute "Obligations" under the Prepetition Term Loan Agreement, and subject to the Intercreditor Agreement are secured by the Prepetition Term Loan Liens.

---

[4] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Intercreditor Agreement.

13

42.     As of the Petition Date, the aggregate outstanding amount of principal and interest under the Vendor Program Agreement is approximately $2.8 million.

**B.      General Unsecured Creditors**

43.     As of the Petition Date, the Debtors estimate that unsecured claims against the Debtors are in excess of $54 million.   Unsecured claims against the Debtors include (i) accrued and unpaid trade and other unsecured debt incurred in the ordinary course of the Debtors' business, (ii) unpaid amounts owed to the Debtors' vendors, and (iii) claims for unpaid rent and other obligations under the Debtors' leases.  As leases are rejected during the Chapter 11 Cases, the number of unsecured claims will increase significantly.

**C.      Common Stock**

44.     As of December 31, 2020, CB Corp. had 38,546,330 shares of common stock outstanding, excluding shares of Treasury stock, held by approximately 130 registered shareholders.   As of the Petition Date, Marcellum Retail Opportunity Fund, L.P. holds approximately 13.1% of the shares  and Cleveland Capital, L.P. holds approximately 6.1%.

**IV.      THE NEED FOR CHAPTER 11 RELIEF AND THE EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES**

**A.      COVID-19**

45.     The Debtors' chapter 11 filing is primarily the result of the adverse impact of COVID-19 pandemic on the Debtors' revenue, results of operations and cash flows.  The Debtors' revenue is highly dependent on in-store sales, which for the fiscal year 2019 accounted for over 75% of the Debtors' net sales.  While the Debtors have a broad and loyal customer base, the impact of the COVID-19 pandemic and the measures aimed at reducing the virus' spread have caused a considerable decline in revenue.  As a result of the store closures, reduced store capacity and other COVID-19 measures, traffic volume at the Debtors' stores, net sales were

14

approximately $73 million for the third quarter of 2020, a decline of 22.6% from the same

quarter in 2019.   The Debtors' holiday sales were similarly affected as the Debtors' customers

have limited demand for new outfits in the absence of social engagements and customers remain

hesitant to shop in stores.

46.    In response to the COVID-19 pandemic, the Debtors took aggressive and prudent

measures to reduce expenses and defer payments of accounts payable and inventory purchases to

preserve cash on hand.  Examples of such measure included: (i) a temporary furlough of all store

and most distribution center and corporate associates; (ii) a temporary reduction in base salary

for corporate employees and management ranging from 20% to 50% for myself;[5] (iii) a reduction

in Board of Director retainer fees; and (iv) suspension of rent payments to landlords while stores

were closed.  Additionally, the Debtors worked closely with their merchandise partners to reduce

orders and extend payment terms, having cancelled as many spring/summer inventory orders as

possible while holding over some core product.

47.    In early June 2020, the Debtors applied for and received $10 million in loan

proceeds under the Paycheck Protection Program ("**PPP**") of the Coronavirus Aid, Relief, and

Economic Security Act (the "**CARES Act**").  The Debtors applied the loan proceeds toward the

payment of qualified payroll expenses in accordance with the conditions of the PPP.[6]

48.    Despite the Debtors best efforts to mitigate the impact of COVID-19, they were

unable to keep pace with the impact of COVID-19 on sales and the Debtors' ongoing rent

---

[5] As of July 12, 202, the Debtors restored base salaries and director retainer payments to levels effective before March 22, 2020.

[6] On October 27, 2020, Cache Valley Bank submitted the Debtors' PPP loan forgiveness application to the Small Business Administration (the "**SBA**").  The 90-day period for the SBA to review the application and issue a decision regarding forgiveness expires on or about January 25, 2021.  The Debtors believe the SBA will approve the loan forgiveness application and that the loan principal will be entirely forgiven.

obligations.  Even with the Debtors' cost-cutting measures, current market conditions have made it impossible for the Debtors to obtain the capital needed to continue to maintain their business.

**B.**    **Diminished Operating Performance**

49.    Before the onset of COVID-19, the Debtors, like many other retail companies, have also faced a challenging commercial environment over the past several years.  The Debtors' challenges have been exacerbated by increased competition from big-box retailers, and a shift in customer preferences away from physical retail stores and toward online-only stores.  Given the Debtors' substantial brick-and-mortar presence (operating 449 stores as of the Petition Date), their business has been heavily dependent on in-store traffic, which has declined in recent years.

**C.**    **Landlord, Vendor and Supplier Issues**

50.    Due to insufficient liquidity and inability to access stores as a result of certain states ordering the closure or drastic limitation of "non-essential" business functions, or otherwise ordering "stay-at-home" orders or similar orders, the Debtors did not pay rent on their stores while closed and significantly curtailed payments to the majority of their vendors, suppliers, service providers and other trade creditors.

51.    Given the Debtors' current liquidity constraints, they again suspended rental payments to landlords again beginning in November 2020.  The Debtors have received numerous notices of default from landlords and certain landlords have become more aggressive including exercising self-help in two of the Debtors' locations in Idaho.  While certain landlords agreed to forestall remedies, there exists the constant overhang of landlords exercising remedies in the near term.  Such a result would be value destructive, preventing the Debtors from monetizing their inventory.  It has become clear that the Debtors require the protections afforded by the Bankruptcy Code to prevent landlords from pursuing eviction proceedings and exercising self-help to terminate the Debtors' leases and/or seize their inventory to satisfy rents due.

16

**D.**     **The Debtors' Consideration of Strategic Alternatives**

52.     Faced with ongoing and significant hurdles, the Prepetition Lenders were

unwilling to continue to provide funding to the Debtors without a sustainable solution.  Toward

that end, in early January 2020, the Prepetition Lenders each declared an event of default under

their respective loan documents.

53.     Recognizing the need to explore strategic alternatives, the Debtors worked with

their advisors to evaluate solutions to the Debtors' deteriorating circumstances.  Beginning in

November 2020, the Debtors began to work with B. Riley, as investment banker, to conduct a

marketing process.  B. Riley and the Debtors prepared a list of in excess of 180 potential

investors (including various financial sponsors and strategic buyers) that were considered likely

participants in a sale process.  Following the initial outreach to the identified parties, information

was provided to these parties to gauge their interest prior to executing a non-disclosure

agreement ("**NDAs**").  Approximately 40 parties executed NDAs.  Parties who executed NDAs

received access to a data room.  No parties were ultimately interested in moving forward with an

acquisition of all or some of the brick-and-mortar stores.

54.     After the Petition Date, the Debtors will commence the process of closing and

winding down 449 brick-and-mortar store locations.  In anticipation of these closings, the

Debtors engaged Hilco, an affiliate of the Term Lender, to begin liquidating the inventory in the

closing stores and otherwise preparing the stores for turnover to the applicable landlords.

55.     In parallel with the store closings, the Debtors, with the assistance of B. Riley, are

marketing the Debtors' growing eCommerce business.  The Debtors and their advisors will

continue to work with the parties that have indicated interest in the eCommerce platform and run

a sale process for the eCommerce platform over the next 45 days in parallel to the store closure

process.  The Debtors intend to file a motion to approve bidding procedures and the sale of the

eCommerce business shortly after the Petition Date.

**E.**    **Proposed Course of the Chapter 11 Cases**

56.    The Debtors believe, in the exercise of their business judgment, that the store

closings and liquidation of the inventory as well as the sale of the eCommerce over the next 45

days will provide the best process under the circumstances to maximize value for their

stakeholders.  The Debtors will utilize cash collateral, having obtained consent of the Prepetition

Lenders.  Consensual use of cash collateral will provide the Debtors with sufficient liquidity to

run going-out-of-business sales and market and sell the eCommerce business, with cash-on-hand

and revenue from the store closing sales projected to be sufficient to support continued

operations, as well as reduce the balance owed to the Prepetition Lenders through structured

paydowns of the Debtors' prepetition indebtedness.

## V.    FIRST DAY MOTIONS

57.    To minimize the adverse effects of the commencement of these Chapter 11 Cases

on the Debtors' ability to effectuate a timely and efficient Chapter 11 liquidation that will

maximize the value of the Debtors' estates, the Debtors have filed a number of First Day

Motions designed to facilitate their transition into Chapter 11.

58.    I anticipate that the Court will conduct a hearing soon after the Petition Date at

which the Court will hear and consider many of the First Day Motions.  Many of the First Day

Motions seek authority to pay certain pre-petition claims.  I understand that Rule 6003 of the

Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not

consider motions to pay pre-petition claims during the first twenty-one days following the filing

of a chapter 11 petition, "[e]xcept to the extent that relief is necessary to avoid immediate and

irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests

for immediate authority to pay pre-petition claims to instances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Other relief will be deferred for consideration at a "second day" hearing.

59.    I have reviewed each of the First Day Motions with the Debtors' counsel and the facts stated therein are true and correct to the best of my knowledge, information, and belief.  I believe that the relief sought in each of the First Day Motions is tailored to meet the goals described above, is necessary and critical to the Debtors' liquidation efforts, and is in the best interests of the Debtors' estates and creditors.  A detailed discussion of the facts supporting and the relief requested in each of the First Day Motions is included in the attached **Exhibit B**.  I hereby adopt and affirm the factual representations contained in each of the First Day Motions.

## VI.    <u>CONCLUSION</u>

60.    This declaration describes the factors that have precipitated the commencement of the Chapter 11 Cases and demonstrates the critical need for the Debtors to obtain the relief sought in the First Day Motions.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: January 13, 2021                    By:    _/s/ Keri L. Jones_
                                                              Keri L. Jones
                                                              Chief Executive Officer

61893/0001-21908209v4

**EXHIBIT A**

61893/0001-21908209v4

## Christopher & Banks Corporate Structure

**Christopher & Banks Corporation**
**06-1195422**
Parent Company - Publically Traded
On the OTC Markets (CBKC)

**Christopher & Banks, Inc.**
**41-0851237**
A wholly owned subsidiary of
Christopher & Banks Corporation
(Owns and operates all stores and our eCommerce website)

**Christopher & Banks Company**
**41-2022506**
A wholly owned subsidiary of
Christopher & Banks, Inc.
(Purchases inventory for all stores and the website)

**<u>EXHIBIT B</u>**

# EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS[1]

## Administrative and Procedural First Day Motions

### A.        Debtors' Application for Expedited Consideration of First Day Matters

1.        The Debtors request entry of an Order granting expedited consideration of their First Day Motions.  I believe that the relief requested in this application is essential to avoid any disruption the commencement of these Chapter 11 Cases may have on the Debtors, will facilitate the Debtors' orderly transition into Chapter 11, and will preserve the value of the Debtors' assets.  Accordingly, I respectfully submit that the Debtors' request for expedited consideration of the First Day Motions be approved.

### B.   Debtors' Motion Pursuant to Fed. R. Bankr. P. 1015(b) for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases

2.        The Debtors request entry of an order jointly administering these Chapter 11 Cases for procedural purposes only and request that the Court instruct the Clerk of Court to make an entry on each Debtor's docket reflecting the joint administration of these Chapter 11 Cases. Each of the Debtors is "affiliated" with the others as defined by section 101(2) of the Bankruptcy Code.  Joint administration of these cases will avoid the unnecessary time and expense of drafting, filing, and serving duplicative motions, applications, orders, and other papers and related notices in each case.  Moreover, joint administration will relieve this Court of the burden of entering duplicative orders and maintaining duplicative dockets and files and will ease the burden on the U.S. Trustee in supervising these cases.  The Debtors also request authority to file the monthly operating reports on a consolidated basis in the lead Debtor's case.  I respectfully

---

[1]  Capitalized terms used but not defined in this Exhibit B have the meanings ascribed to them in the First Day Declaration and their respective First Day Motions.

submit that joint administration will save considerable time and expense for all parties-in-interest and this Court and the relief requested should be granted.

### C. **Debtors' Application for Designation as Complex Chapter 11 Cases**

3.     The Debtors request entry of an order designating the Debtors' Chapter 11 Cases as complex cases pursuant to the Court's General Order Governing Procedures for Complex Chapter 11 Cases, dated November 25, 2009.  These Chapter 11 Cases qualify as complex chapter 11 cases because the Debtors (a) have total liabilities of approximately $105 million; (b) have total assets of approximately $166 million; and (c) collectively have more than 8,000 potential creditors and parties-in-interest, including employees and vendors.  These Chapter 11 Cases would be administered most efficiently as complex chapter 11 cases.  I believe that the relief requested in the application will enable the Debtors to continue to operate their businesses in a streamlined fashion and allow the U.S. Trustee and other parties-in-interest to monitor these Chapter 11 Cases with greater ease and efficiency.  Accordingly, I respectfully submit that the Debtors' cases should be designated complex cases.

### D. **Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 521(a)(1)(b) and Fed. R. Bankr. P. 1007(c) for Entry of an Order Extending Time to File Their Schedules of Assets and Liabilities and Statements of Financial Affairs**

4.     The Debtors request entry of an order granting a thirty-day extension of the time to file their Schedules and Statements for a total of forty-four (44) days after the Petition Date without prejudice their right to request additional time.  Preparing the Schedules and Statements will require the Debtors' employees and professionals to devote substantial time and effort to analyzing the Debtors' various constituencies on an entity-by-entity basis.  Given the size and complexity of their operations, the Debtors anticipate that they will be unable to complete their Schedules in the fourteen (14) days provided under Bankruptcy Rule 1007(c) and that it would

2

be unnecessarily burdensome to attempt to do so during the first fourteen days of these Chapter

11 Cases.  I believe that the extension requested is in the best interests of the Debtors' estates,

creditors, and all parties-in-interest, and will enable the Debtors to continue to operate their

business in chapter 11 without disruption.  Accordingly, I respectfully submit that the Court

should grant the Debtors' motion seeking an extension of time in which to file their Schedules

and Statements.

**E.  Debtors' Application Pursuant to 28 U.S.C. § 156(c) and 11 U.S.C. § 105(a) for Entry of an Order Authorizing the Appointment of Omni Agent Solutions as Claims and Noticing Agent Nunc *Pro Tunc* to the Petition Date**

5.       The Debtors seek entry of an Order appointing Omni Agent Solutions as claims

and noticing agent in these Chapter 11 Cases because it has significant experience in both the

legal and administrative aspects of large, complex chapter 11 cases and its professionals have

experience in noticing, claims administration, solicitation, balloting, and facilitating other

administrative aspects of chapter 11 cases and experience in matters of this size and complexity.

I believe that Omni Agent Solutions' appointment is the most effective and efficient manner of

noticing creditors and parties-in-interest of the filing of and developments in these cases.  In

addition, Omni Agent Solutions will transmit, receive, docket and maintain proofs of claim filed

in connection with these cases.  Accordingly, I believe that the appointment of Omni Agent

Solutions to act as an agent of this Court is in the best interests of the Debtors' estates, their

creditors, and all parties-in-interest and respectfully submit that the Court should grant the

Debtors' motion to appoint Omni Agent Solutions.[2]

---

[2] The Debtors intend to file a subsequent application to retain Omni Agent Solutions to perform certain administrative services under section 327 of the Bankruptcy Code.

**F.** **Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 521, and Fed. R. Bankr. P. 1007(a) and 2002(a) and (a), for Entry of an Order Authorizing the Debtors to (A) Prepare a List of Creditors in Lieu of a Formatted Mailing Matrix, (B) File a Consolidated List of the Debtors' 20 Largest Unsecured Creditors, (C) Redact Certain Personal Identification Information and (D) Mail Initial Notices**

6.      The Debtors seek entry of an order authorizing them to file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor, to file a consolidated list of their top 30 creditors, and to mail initial notices.  Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be burdensome, result in duplicate mailings, and could increase the risk of errors in translating the Debtors' computerized information into a .txt mailing matrix.  Separately, filing a single consolidated list of the Debtors' combined 30 largest unsecured creditors in these Chapter 11 Cases would be more reflective of the unsecured creditor body than filing separate lists for each of the Debtors.  Finally, to alleviate the administrative and economic burdens that these Chapter 11 Cases may impose upon the Court and the Clerk's office, the Debtors propose that Omni Agent Solutions undertake all mailings directed by this Court or the U.S. Trustee or required by the Bankruptcy Code or Bankruptcy Rules.  Omni Agent Solutions will, among other things, serve the notice of commencement of these Chapter 11 Cases, thus ensuring that all creditors and parties-in-interest receive timely and proper notice of filing of the Debtors' petitions as well as the date, time, and location for the first meeting of creditors pursuant to section 341 of the Bankruptcy Code.  In sum, I respectfully submit that the Court should grant the relief requested in this motion in order to alleviate unnecessary administrative burdens during the course of these Chapter 11 Cases.

61893/0001-21908209v4

**Operational First Day Pleadings**

**A. Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying Automatic Stay; (III Scheduling a Final Hearing; and (IV) Granting Related Relief (the "Cash Collateral Motion")**

7.      By way of the Cash Collateral Motion, the Debtors seek entry of an order authorizing them to use the Cash Collateral of the Prepetition ABL Lender, ReStore Capital, LLC, and the Prepetition Term Lenders, ALCC, LLC.[3]  In order to ensure they have sufficient funds to maintain the stability of their business throughout the completion of the store closing sales, the Debtors intend to use the Cash Collateral, with the consent of the Prepetition Credit Parties, in accordance with the terms of a budget that reflects the financial needs of the Debtors over the course of the Chapter 11 Cases.  In exchange for the use of their Cash Collateral, the Debtors intend to grant adequate protection to the Prepetition Credit Parties (as that term is defined in the Cash Collateral Motion) as set forth in more detail in the Cash Collateral Motion. The proposed adequate protection package provides the Prepetition Credit Parties with a variety of safeguards to protect against any diminution in the value of the Cash Collateral.

8.      Absent approval of the use of Cash Collateral on the terms set forth in the Interim Order, the Debtors will not have sufficient liquidity to maintain their operations during the store closing sales, including the funding of employee payroll and benefit obligations, as well as satisfying required working capital and operational expenses during these Chapter 11 Cases. Thus, without immediate access to Cash Collateral, the Debtors would be required to cease operations resulting in a substantial loss of value to the detriment of all stakeholders.

---

[3] Immediately before the Petition Date, the Prepetition ABL Credit Documents and the Prepetition ABL Facility were assigned by Wells Fargo Bank, National Association to ReStore Capital, LLC, an affiliate of the Prepetition Term Lenders.

5

9.      Based on the foregoing, I believe the relief requested in the Cash Collateral

Motion is critical to the preservation of value while the Debtors pursue an orderly liquidation.

A.  **Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 345(b), 363, and 503(b) for Entry of Interim and Final Orders (I) Approving Cash Management System; (II) Authorizing the Debtors to Continue (A) Using the P-Card Program; (B) Using Existing Bank Accounts and Business Forms; and (C) Intercompany Transactions; (III) Granting Interim and Final Waivers of the Debtors' Compliance with Section 345(b) of the Bankruptcy Code; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief (the "Cash Management Motion")**

10.      In the Cash Management Motion, the Debtors request interim and final authority

to (i) continue their existing Cash Management System, (ii) continue maintenance of their

existing Bank Accounts and Business Forms, (iii) implement changes to their Cash Management

System in the ordinary course of business, including, without limitation, opening new or closing

existing Bank Accounts, in their business judgment and at their sole discretion; (iv) continue to

perform under and honor Intercompany Transactions in the ordinary course of business, in their

business judgment and at their sole discretion; and (v) provide the U.S. Trustee with a 60-day

objection period to object to the relief requested therein.

11.      In connection with this relief, the Debtors request a waiver of certain of the

operating guidelines established by the U.S. Trustee that require the Debtors to close all of their

prepetition bank accounts, open new accounts designated as debtor in possession accounts, and

obtain new business forms and statements.

12.      The Debtors further request that the Court authorize and direct the Banks to

(a) continue to maintain, service, and administer the Debtors' Bank Accounts, and (b) debit the

Bank Accounts in the ordinary course of business on account of (i) wire transfers or checks

drawn on the Bank Accounts, provided that any payments drawn, issued, or made prior to the

Petition Date shall not be honored absent direction of the Debtors and a separate order of the Court authorizing such pre-petition payment, or (ii) Bank Charges.

13.     Further, the Debtors request that the Court grant interim and final waivers of the requirements of section 345(b) of the Bankruptcy Code.

14.     Finally, the Debtors request that all postpetition Intercompany Claims be granted administrative expense priority status, which will facilitate the orderly and efficient operation of the Debtors' enterprise.

15.     The Debtors use an integrated, centralized Cash Management System to collect, concentrate, and disburse funds generated by their operations.  The Cash Management System is tailored to meet the Debtors' operating needs as the operator of well over 400 retail stores and an e-commerce platform.  The Cash Management System enables the Debtors to efficiently collect and disburse cash generated by their businesses, pay their financial obligations, centrally control and monitor corporate funds and available cash, comply with the requirements of their financing agreements, reduce administrative expenses, and efficiently obtain accurate account balances and other financial data.  The Debtors' Finance Department oversees the Cash Management System and the Debtors maintain records of all transactions processed through their Cash Management System.  Although some of the Cash Management System is automated, Finance Department personnel monitor the Bank Accounts and manage the collection and disbursement of funds.

16.     I believe the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the Debtors to continue to operate their business in these Chapter 11 Cases with minimal disruption. Most significantly, maintaining the Cash Management System in its current state is crucial to the Debtors' continued operations, given the significant number of cash transactions processed

61893/0001-21908209v4

through the Cash Management System each day.  Any disruption to the Cash Management

System would significantly hinder the Debtors' day-to-day operations and impede the successful

administration of their estates.  In light of the foregoing, and for the reasons set forth in the Cash

Management Motion, I respectfully submit that the Cash Management Motion should be granted.

Absent the relief requested in the Cash Management Motion, the Debtors and their estates would

suffer immediate and irreparable harm.

**B.** **Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a), and 541 for Entry of an Order Authorizing, But Not Directing, the Debtors to Pay Certain Pre-Petition Taxes and Fees (the "Tax Motion")**

17.     In the Tax Motion, the Debtors request entry of interim and final orders

authorizing, but not directing, the payment of Sales and Use Taxes, in the ordinary course of

business and without regard to whether such obligations accrued or arose before or after the

Petition Date.

18.     In the ordinary course of business, the Debtors collect, withhold, or incur an

assortment of state and local Sales and Use Taxes and remit same to various state and local taxing

Authorities when due.  The pre-petition Sales and Use Taxes are not property of the Debtors'

estates but, rather, are held in trust for the Authorities.  The Debtors seek to pay the pre-petition

Sales and Use Taxes in order to, among other things, prevent the Authorities from taking actions

that might interfere with the Debtors' administration of the Chapter 11 Cases, which may include

bringing personal liability actions against the Debtors' directors, officers, and other key

employees (whose full-time attention to the Debtors' Chapter 11 Cases is required to avoid

business disruptions and maximize recoveries to the Debtors' creditors) or assessing penalties

and/or significant interest on past-due taxes.  In addition, non-payment of the Sales and Use

8

Taxes may give rise to priority claims pursuant to section 507(a)(8) of the Bankruptcy Code. Accordingly, the Debtors submit that the proposed relief is in the best interest of their estates.

19.    Prior to the Petition Date, the Debtors engaged Avalara, Inc. ("**Avalara**") to administer their compliance requirements for Sale and Use Taxes, including the preparation and filing of applicable returns and the processing and remittance of Sales and Use Taxes to the applicable Authorities.  As part of the Debtors' relationship with Avalara, the Debtors transfer the requisite funds to Avalara on account of amounts due for each applicable period, and Avalara subsequently remits such funds to the applicable Authorities for the benefit of the Debtors.  The Debtors pay Avalara annual service fees of approximately $33,000 to administer their Sales and Use Taxes compliance and $44.00 per overage return filed over and above the included number of returns as part of the Debtors' annual services package. As of the Petition Date, the Debtors do not believe anything is owed Avalara for services related to the Sales and Use Taxes.

20.    Although the Debtors believe they are current with respect to their payment of Sales and Use Taxes, the Debtors estimate that, as of the Petition Date, they have collected or incurred approximately  $2,256,000 in pre-petition Sales and Use Taxes that have not yet been remitted to the appropriate Authorities.  The Debtors estimate that approximately $1,727,000 in pre-petition Sales and Use Taxes will become due and payable within twenty-one (21) days following the Petition Date.

21.    The Debtors must continue to pay the Sales and Use Taxes to continue their business and avoid costly distractions during the Chapter 11 Cases.  The failure to pay the Sales and Use Taxes could adversely affect the Debtors' business operations.  In addition, certain Authorities may take precipitous action against the Debtors' officers and directors for unpaid Sales and Use Taxes, which undoubtedly would distract those key individuals from their duties.

61893/0001-21908209v4

For the reasons set forth herein and in the Tax Motion, I respectfully submit that the relief

requested in the Tax Motion is in the best interest of the Debtors' estates and creditors.  Absent

the relief requested in the Tax Motion, the Debtors and their estates could suffer immediate and

irreparable harm.

**C.  Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 363, and 507(a) for Interim and Final Authority to (I) Pay Certain Pre-Petition Wages and Reimbursable Employee Expenses, (II) Pay and Honor Employee Medical and Other Benefits, and (III) Continue Employee Benefits Programs, and for Related Relief (the "Wages Motion")**

22.    In the Wages Motion, the Debtors seek entry of interim and final orders

authorizing, but not directing, them to pay certain pre-petition claims and obligations, continue

programs and maintain funding, in the exercise of their discretion, relating to, among other

things: (i) Unpaid Compensation, Deductions, Payroll Maintenance Fees, and Payroll Taxes;

(ii) Incentive Plans; (iii) Reimbursable Expenses; (iv) Employee Benefit Programs; (v) the

401(k) Savings Plan; and (vi) the Severance Programs.

23.    To enable the Debtors to carry out the relief requested, the Debtors also request

that the Court authorize and direct financial institutions to receive, process, honor and pay all

checks presented for payment and electronic payment requests relating to the foregoing to the

extent the Debtors have sufficient funds standing to their credit with such bank, whether such

checks were presented or electronic requests were submitted before or after the Petition Date,

and provide that all such financial institutions are authorized to rely on the Debtors' designation

of any particular check or electronic payment request as appropriate pursuant to the Wages

Motion without any duty of further inquiry and without liability for following the Debtors'

instructions.

61893/0001-21908209v4

24.     As of the Petition Date, the Debtors employ approximately 2,991 Employees, approximately 1,044 of whom work full time and approximately 1,947 of whom work part-time. Full-Time Employees are those that are regularly scheduled to work thirty (30) hours or more per week and Part-Time Employees are those that are regularly scheduled to work less than thirty (30) hours per week.  The Debtors pay salaries to 96 of their Employees and pay hourly wages to 2,895 of their Employees.  The Debtors sometimes utilize temporary or contract employees, as well as seasonal employees.  As of the Petition Date, the Debtors are utilizing 3 such temporary employees.  The Debtors' retail store employees are employed by Debtor Christopher & Banks Inc.  The Debtors' corporate employees are employed by CB Corp.  The Debtors' employees that work in the Distribution Center, and those in the marketing, merchandising, and purchasing departments are employed by Debtor Christopher and Banks Company.

25.     The Debtors' Employees are the lifeblood of their business; their value cannot be overstated.  The Employees perform critical functions, including sales, customer service, information technology, purchasing, administrative, accounting, finance, and management-related tasks.  Their skills and experience, as well as their relationships with customers and vendors and knowledge of the Debtors' infrastructure, are essential to the Debtors' ongoing operations and ability to effectively operate their businesses during these Chapter 11 Cases.

26.     The relief requested in the Wages Motion is necessary for the Debtors to be able to maintain morale, continue to service the needs of their customers, and preserve creditor confidence in their continued operations.  Absent the relief sought in the Wages Motion, the Debtors' Employees may seek alternative opportunities, perhaps with the Debtors' competitors. The loss of valuable Employees would deplete the Debtors' workforce, thereby hindering the Debtors' ability to meet their customer obligations and, likely, impair the Debtors' ability to

maximize value for the benefit of all of their stakeholders, including the Employees.  Moreover, I

believe the Debtors' failure to satisfy Employee Obligations would jeopardize Employee morale

and loyalty at a time when Employee support is most critical to the Debtors' businesses.

Increased instability in the Debtors' workforce will undermine the Debtors' ability to complete

the store closing sales that are critical to generating immediate liquidity

27.    The majority of the Debtors' Employees rely exclusively on their compensation

and benefits to satisfy their daily living expenses.  These Employees would be exposed to

significant financial difficulties and other distractions if the Debtors are not permitted to honor

their obligations for unpaid compensation, benefits, and reimbursable expenses.  Furthermore, if

the Court does not authorize the Debtors to honor their various obligations under the various

Health Care Plans, the Employees be without health coverage and, thus, may become obligated

to pay certain health care claims in cases where the Debtors have not paid the respective

insurance providers.  The loss of health care coverage will result in considerable anxiety for

Employees (and likely attrition) at a time when the Debtors need such Employees to perform

their jobs at peak efficiency.  Additionally, as noted above, Employee attrition would cause the

Debtors to incur additional expenses to find appropriate and experienced replacements, severely

disrupting the Debtors' operations at a critical juncture.

28.    Accordingly, for the reasons set forth herein and in the Wages Motion, I

respectfully submit that the relief requested in the Wages Motion is necessary and critical to the

Debtors' ability to preserve value for the benefit of the Debtors' estates, their creditors, and all

parties-in-interest, and will enable the Debtors to continue to operate their businesses in these

Chapter 11 Cases with minimal disruption, thereby maximizing the value for the estates.  Absent

the relief sought in the Wages Motion, the Debtors and their estates would suffer immediate and irreparable harm.

**D. Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b) for Interim and Final Authority to (I) Maintain, Renew, and Continue Their Insurance Policies and Programs and (II) Honor All Insurance Obligations (the "Insurance Motion")**

29.    In the Insurance Motion, the Debtors seek entry of an order authorizing, but not directing, them to (i) continue to maintain, renew, and continue their Insurance Policies and Programs and honor their Insurance Obligations in the ordinary course of business during the administration of these Chapter 11 Cases and (ii) pay any pre-petition Insurance Obligations, including, without limitation, amounts owed to the Insurance Brokers.

30.    The Debtors' Insurance Policies and Programs are essential to the preservation of value of the Debtors' businesses, leasehold estates, and assets.  I understand that, in many instances, the insurance coverage provided by the Insurance Policies and Programs, including the Workers' Compensation Programs, is required by the various regulations, laws, and contracts that govern the Debtors' commercial activities as well as by the Bankruptcy Code and the U.S. Trustee.  Accordingly, failure to honor the Insurance Obligations could have a significant negative impact on the Debtors' operations.

31.    The aggregate amount of Insurance Premiums for the 2020 to 2021 renewal cycle of the Insurance Policies was approximately $1.5 million.  The Debtors currently finance most of their Insurance Premium obligations through Insurance Premium Financing Companies.  With the exception of the Debtors' Workers' Compensation Programs, all of the Debtors' current Insurance Policies and Programs expire between January 31, 2021 and February 28, 2021.  In light of the imminent expiration of all of their Insurance Policies and Programs, shortly prior to the Petition Date, the Debtors, with the help of their Insurance Broker, began accessing the

13

insurance markets to determine the availability, pricing, and terms of new or renewed Insurance

Policies and Programs.  During this period, the Debtors successfully negotiated and bound a

directors and officers insurance policy for the 2021-2022 policy year.  Due to the Debtors'

financial condition, the Debtors were required to pay cash in advance in connection with that

coverage.  The Debtors and their Insurance Broker are continuing to negotiate extended, new,

and/or renewed polces for the Debtors' remaining Insurance Policies and Programs to ensure

continuing compliance with all applicable laws.  The Debtors are optimistic that they will be able

to finance their remaining Insurance Policies and Programs.  By way of the Insurance Motion,

and in light of the imminent renewal of the majority Insurance Policies and Programs, the

Debtors seek authority to incur additional insurance premium financing in the ordinary course of

business upon the expiration of the current Insurance Policies and Programs without the need for

separate approval from the Court.

32.    The Insurance Policies and Programs are essential to preserving the value of the

Debtors' business operations and assets.  Accordingly, for the reasons set forth herein and in the

Insurance Motion, I respectfully submit that the relief requested in the Insurance Motion is in the

best interests of the Debtors, their estates, and all parties-in-interest and will enable the Debtors

to continue to operate their businesses and preserve the value of their estates.  Absent the relief

requested, the Debtors and their estates would suffer immediate and irreparable harm.

**E.    Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 366 for Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services, and (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service the ("Utility Motion")**

33.    Pursuant to the Utilities Motion, the Debtors seek entry of interim and final

orders (i) approving the Debtors' proposed form of adequate assurance of payment to utility

providers, (ii) establishing procedures for determining adequate assurance of payment for future

utility services, and (iii) prohibiting utility providers from altering or discontinuing utility service

on account of an outstanding prepetition invoice.

34.     In the ordinary course of their business, the Debtors receive utility services from

various Utility Providers for, among other things, electricity, natural gas, water, and

telecommunications services.  The Utility Providers include, without limitation, the entities set

forth on the Utility Service List, a copy of which is attached as Exhibit A to the Utility Motion.

On average, the Debtors spend approximately $403,000 each month on utility costs.  That

calculation includes amounts paid to certain of the Debtors' landlords who, in turn, are

responsible for paying the relevant utility companies.

35.     The Debtors intend to pay post-petition obligations owed to the Utility Providers

in a timely manner.  The Debtors expect that cash flows from operations will be sufficient to pay

post-petition utility obligations in the ordinary course of business.  Nevertheless, the Debtors

propose to deposit in the Adequate Assurance Account, within twenty (20) days following entry

of an interim order granting the Utility Motion, an Adequate Assurance Deposit for each Utility

Provider that the Debtors pay directly (less any amounts already on deposit with any such Utility

Provider that have not been applied to outstanding prepetition amounts), based on the Debtors'

average usage for the year ending 2020.  As of the Petition Date, the Debtors estimate that the

Adequate Assurance Deposit will total approximately $193,500.

36.     Through the Utility Motion, the Debtors seek orders approving their Proposed

Adequate Assurance to Utility Providers as adequate within the meaning of section 366 of the

Bankruptcy Code and granting them authority to implement, and require Utility Providers to

comply with, the Proposed Adequate Assurance Procedures in connection therewith.  These

61893/0001-21908209v4

procedures will allow Utility Providers to request additional adequate assurance for unpaid utility services if they believe the proposed amount is insufficient.

37.     Preserving utility services on an uninterrupted basis is essential to the Debtors' operations.  Any interruption in utility services, however brief, would seriously disrupt the Debtors' ability to continue operations and service their customers.  This disruption would adversely impact customer relationships and would result in a decline in the Debtors' revenues.  Such a result could jeopardize the Debtors' efforts to maximize value for the benefit of their creditors.  Therefore, it is critical that utility services continue uninterrupted during these Chapter 11 Cases.  I am advised that if the Adequate Assurance Procedures are not approved, the Debtors may be (and I believe likely will be) confronted with and forced to address numerous requests by their Utility Providers at a critical point in their Chapter 11 Cases.  Moreover, the Debtors could be blindsided by a Utility Provider unilaterally deciding—on or after the 30th day following the Petition Date—that it is not adequately protected and either making an exorbitant demand for payment to continue service or electing to discontinue service to the Debtors altogether.  Such an outcome could seriously jeopardize the Debtors' operations, asset values, and ability to maximize recoveries to their stakeholders.

38.     Accordingly, for the reasons set forth herein and in the Utilities Motion, I respectfully submit that the relief requested in the Utilities Motion is necessary and in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the Debtors to continue to operate their business and to safeguard the value of their estates.

61893/0001-21908209v4

**F. Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b), 365 and 507(a) for Interim and Final Authority to (I) Maintain and Administer Pre-Petition Customer Programs, Promotions, and Practices, as Modified (II) Pay and Honor Related Pre-Petition Obligations, and (III) Direct the Credit Card Processors to Honor the Debtors' Credit Card Processing Agreements Pending Their Assumption or Rejection (the "Customer Programs Motion")**

39.      In the Customer Programs Motion, the Debtors request authority, in the ordinary course of business and consistent with past practice, to maintain, administer, pay, and otherwise honor their pre-petition Customer Programs, Promotions, Practices, and Processing Obligations, as modified in the Customer Programs Motion, whether arising prior to or after the Petition Date, as necessary and appropriate in the Debtors' business judgment.  Additionally, pursuant to sections 365 and 105(a) of the Bankruptcy Code, the Debtors request entry of an order directing the Payment Processing Company to honor the Processing Agreements pending assumption or rejection.

**(i)      The Customer Programs.**

40.      The Debtors have historically offered various return and exchange policies, gift cards, private label credit card loyalty rewards program, sales promotions and other practices and programs. The Customer Programs are standard in the retail industry, provided incentives to existing customers to shop with the Debtors, and attracted new customers to the Debtors' stores and website.  The Customer Programs are designed to promote customer satisfaction and inure to the goodwill of the Debtors' businesses and the value of their brand.  Maintaining the goodwill of their customers is critical to the Debtors' ongoing operations in these Chapter 11 Cases, through the completion of the liquidation, and is necessary to maximize the value of the Debtors' businesses for the benefit of the Debtors' estates, creditors, and all parties-in-interest. The Customer Programs include Return and Exchange Policies, a Gift Card Program, a loyalty

61893/0001-21908209v4

program referred to as the Friendship Rewards Program and related private label card, and various Coupons and other Sales Promotions.

41.      The Debtors estimate that, as of the Petition Date, there are approximately $11,055,000[4] in valid, outstanding obligations under the Gift Card Program.

42.      I believe that continuing to honor the Customer Programs, as modified in the Customer Programs Motion, during the pendency of these Chapter 11 Cases is critical to preserving the value of the Debtors' assets by protecting the Debtors' valuable customer relationship and goodwill, all of which will inure to the benefit of the Debtors' estates, their creditors, and all parties-in-interest.  In contrast, if the Debtors were unable to continue the Customer Programs, the Debtors would risk alienating their customers and could jeopardize their ability to maximize value for their estates during the liquidation process.  In sum, I believe that the failure to honor the Customer Programs, as modified, could adversely impact the Debtors' store closing sales and corresponding value to their estates.

### (ii)      The Processing Obligations

43.      In addition to cash, checks, coupons, Gift Cards, rewards under the Christopher & Banks private label card, and rewards under the Friendship Rewards Program, the Debtors accept Credit Cards and other forms of non-cash payment.  The Debtors rely on their Payment Processing Companies to process such payments pursuant to Payment Processing Agreements. It is possible that certain Processing Obligations incurred by the Debtors immediately before the Petition Date may not have been fully netted out against the payments received by the Debtors before the Petition Date.  In order to avoid disrupting vital payment processing services, the

---

[4] This figure also includes outstanding merchandise credits as part of the Debtors' Return and Exchange Policies.  This figure is also a gross amount and does not include estimated breakage recorded by the Debtors.

61893/0001-21908209v4

Debtors (i) seek authority to continue to pay the Processing Obligations, including pre-petition Processing Obligations, in the ordinary course of their business, and (ii) request that the Court authorize the Payment Processing Company to offset the Processing Obligations against amounts remitted to the Debtors, in each case in the ordinary course, whether arising before or after the Petition Date.

44.     In order to effectuate a smooth transition into these Chapter 11 Cases, the Debtors must maintain customer loyalty and goodwill through the Customer Programs and must continue to honor their Processing Obligations.  The Customer Programs and the Debtors' relationship with the Payment Processing Companies are essential to preserving the value of the Debtors' business operations pending a sale of their assets.  Accordingly, for the reasons set forth herein and in the Customer Programs Motion, I respectfully submit that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the Debtors to continue to operate their business and to safeguard the value of their estates.  Absent the relief requested in the Customer Programs Motion, the Debtors and their estates would suffer immediate and irreparable harm.

## G.  **Debtors' Motion Pursuant to 11 U.S.C. §§ 105 and 363 for Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Freight Forwarders, Carriers, Warehousemen and Similar Claimants, and (II) Granting Related Relief (the "Shippers' Motion")**

45.     In the Shippers' Motion, the Debtors request entry of interim and final orders authorizing, but not requiring, the Debtors, in their sole discretion, to pay certain pre-petition claims of Radial, Shippers and Warehousemen, and certain Import Charges.

46.     As set forth in the First Day Declaration, the Debtors are a specialty retailer of privately branded women's apparel and accessories.  The Debtors were first founded in 1956, and have grown to now operate approximately 449 retail stores in 44 states while also growing a

19

substantial eCommerce business.  In operating their retail and eCommerce businesses, the

Debtors depend on the uninterrupted flow of inventory and other goods through their supply

chain and distribution network, including the purchase, importation, warehousing, and shipment

of Merchandise.  Generally, the Debtors source Merchandise from third-party manufacturers.

Substantially all of the Debtors' Merchandise is sourced from Vendors located outside the

United States–primarily (but not exclusively) in China, Vietnam, Indonesia, Thailand, and

Jordan. The Debtors' ability to operate in the ordinary course of business therefore depends on

their concurrent ability to transport, import, and take delivery of Merchandise in a timely

fashion.

47.      The Debtors rely on their network of Shippers and Warehousemen in the process

of operating their retail and eCommerce businesses.  In addition, the Debtors rely on Radial, a

third-party for certain fulfillment, shipping, and inventory management services to operate their

business.  Services provided by Radial and the Debtors' Shippers and Warehousemen include air

and ocean transportation (including ocean carriers and ocean consolidators) of Merchandise from

global Vendors to the United States, the coordination and processing of various import duties

and related charges at ports or transportation centers in the United States, and transportation and

storage of Merchandise at the Debtors' warehousing and distribution centers.  As of the Petition

Date, the Debtors estimate approximately $5.965 million[5] in prepetition amounts have accrued

on account of the Shipping and Warehousing Claims (including amounts owed to Radial), all of

which is due or will come due come due within the first 30 days of these chapter 11 cases.

---

[5] The Debtors continue to review the Shipping and Warehousing Claims. Thus, while the Debtors seek
authority to pay up to $5.93 million, the Debtors may in their sole discretion, determine that certain amounts may
not be necessary for their continued operations during these chapter 11 cases, and a lesser amount may be paid.

48.     Because of the commencement of the Chapter 11 Cases, certain Shippers and Warehousemen that hold Merchandise for delivery to or from the Debtors may refuse to release such Merchandise pending receipt of payment for their prepetition services, which would disrupt the Debtors' supply chain and operations. The Debtors believe that a disruption in their chain of transportation and storage arrangements due to nonpayment of shipping and warehouse charges could cause substantial delays, great expense and irreparable harm to the Debtors' estates.

49.     Furthermore, and as set forth above, the Debtors receive substantially all of their Merchandise from foreign countries.  Timely receipt of such Merchandise is critical to the Debtors' business operations, and the Debtors may be required to pay certain Import Charges,[6] including, but not limited to, customs duties, detention and demurrage fees, tariffs, excise taxes, and other similar obligations.  The Debtors estimate that they will need to pay approximately $235,000 in Import Charges during the interim period for Merchandise in transit. The Debtors seek authority to pay any and all necessary and appropriate Import Charges incurred on account of prepetition transactions because payment of Import Charges is critical to ensure the uninterrupted flow of Merchandise.  Absent such payment, Import Claimants may interfere with the Debtors' supply chain. The Debtors believe that a disruption in their supply chain due to nonpayment of Import Charges could cause substantial delays, great expense and irreparable harm to the Debtors' estates.

50.     Maintaining access to the Merchandise and ensuring its orderly distribution is critical to preserving the value thereof and to maximizing the value of the Debtors' businesses.

---

[6] The Debtors maintain a $2.3 million customs bond with the United States Customs and Border Protection Agency through International Fidelity Insurance Company, Harco National Insurance Company, and Allegheny Casualty Company (collectively, "**IFIC**").  The Debtors backstop the bond via a $1,650,000 letter of credit and $650,000 in cash collateral in favor of IFIC.

21

Accordingly, for the reasons set forth herein and in the Shippers' Motion, I respectfully submit that the relief requested in the Shippers' Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the Debtors to continue to operate their business and to safeguard the value of their estates.  Absent the relief requested in the Shippers' Motion, the Debtors and their estates would suffer immediate and irreparable harm.

**H. Debtors' Motion for Interim and Final Orders (A)(1) Confirming, on an Interim Basis, that the Store Closing Agreement is Operative and Effective and (2) Authorizing, on a Final Basis, the Debtors to Assume the Store Closing Agreement, (B) Authorizing and Approving Store Closing Sales Free and Clear of all Liens, claims, and encumbrances, (C) Approving Dispute Resolution Procedures, and (D) Authorizing Customary Bonuses to Employees Of Stores ("Store Closing Motion")**

51.     In the Store Closing Motion, the Debtors seek entry of the Interim and Final Orders (a)(1) authorizing, upon entry of the Final Order, the Debtors to assume the Store Closing Agreement by and among the Agent, Hilco Merchant Resources, LLC and the Debtors, (2) confirming, upon entry of the Interim Order, that the Store Closing Agreement is operative and effective until the Court considers the relief requested by the Motion on a final basis, (b) authorizing the Debtors to continue to conduct store Closing Sales at the Stores and through the Debtors' e-commerce platform, in accordance with the proposed Sale Guidelines, with such sales to be free and clear of all Encumbrances, (c) approving the proposed Resolution Procedures, and (d) authorizing the Store Closing Bonuses.

52.     A copy of the Store Closing Agreement is annexed as Exhibit 1 to the Store Closing Motion and the salient terms thereof are summarized therein.  The Store Closing Agreement was negotiated, proposed, and entered into without collusion, in good faith, and from arm's length bargaining positions.  I believe the assumption of the Store Closing Agreement is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest in light of the

22

Agent's knowledge of the Debtors' assets as well as its experience running similar store closing

sales.  I believe the Agent will be able to maximize the value of the Store Assets and

expeditiously conduct the Closing Sales so that the Debtors may assume, assume and assign, or

reject their underlying leases as they see fit in the exercise of their business judgment.

53.     In connection with the Store Closing Motion, the Debtors also seek approval of

streamlined Sale Guidelines, as set forth in Exhibit 2 to the Store Closing Motion, to sell the

Store Assets free and clear of Encumbrances.  The Debtors have determined, in the exercise of

their business judgment and in consultation with their advisors, and I believe that the Sale

Guidelines are reasonable and will provide the best, most efficient, and most organized means of

selling the Store Assets to maximize their value to the estates.

54.     In addition, the Debtors seek to provide Store Closing Bonuses to non-insider

Store employees who remain employed for the duration of the applicable Closing Sale.  The

Debtors and the Agent worked with BRG to construct the Store Closing Bonus Plan, which is

designed to motivate employees during the Closing Sales and will enable the Debtors to retain

those employees necessary to successfully complete the Closing Sales.  The success of the

Closing Sales depends on store-level employees continuing their ordinary course duties under the

supervision of the Agent and Debtors.  Store employees are necessary to, among other things,

service customers, administer in-store sales, and manage cash receipts and bank deposits.

Replacing such employees would be unfeasible under the contemplated timeframe for the

Closing Sales.  Through the employees' ongoing commitment and performance, the Debtors can

maximize estate value through the Closing Sales.  The Store Closing Bonus Program is a

necessary component of the Closing Sales and has the support of the Debtors' pre-petition

secured lenders and equity holders.

55.     Finally, as set forth in the Store Closing Motion, subject to the Bankruptcy

Court's approval, the Debtors seek the following relief, which will empower the Debtors and the

Agent to conduct the Closing Sales and maximize value for the Debtors' estates, their creditors,

and all parties-in-interest:

(a)     to the extent that any Liquidation Laws purport to interfere with the
Closing Sales, the Debtors seek authority to proceed with the Closing
Sales without the necessity of, and the delay associated with, complying
with such Liquidation Laws;

(b)     approval of the Resolution Procedures in order to facilitate the orderly
resolution of certain disputes between the Debtors and any
Governmental Units regarding the alleged applicability of any
Liquidation Laws;

(c)     relief from any Fast Pay Laws that may apply to employees
terminated in connection with the Store Closings;

(d)     a waiver of any contractual restrictions in leases and other agreements
that could otherwise impair the Debtors' ability to conduct the Closing
Sales at the Stores and maximizing value for creditors; and

(e)     an Order providing that no person or entity, including, without
limitation, Landlord, licensor, property owner, property manager, service
provider, utility provider, or creditor shall interfere with, obstruct, or
otherwise impede the conduct of the Closing Sales or institute any action
or proceeding against the Debtors in any court (other than this Court) or
before any administrative body that in any way directly or indirectly
interferes with, obstructs or otherwise interferes with or adversely affects
the conduct of the Closing Sales or other liquidation sales at the Stores or
seeks to recover damages for breach(es) of covenants or provisions in
any lease, sublease, license, or contract based upon any relief authorized
in the Store Closing Motion.

56.     The Debtors have determined the Closing Sales represent the best alternative to

maximize recoveries to the Debtors' estates with respect to the Stores.  The Debtors believe that

there are meaningful assets at the Stores that the Agent will be able to monetize quickly and

efficiently through an orderly process.  In light of the foregoing, and for the reasons set forth in

the Store Closing Motion, I respectfully submit that the Store Closing Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and should be granted.

**I.** **Debtors' Motion for Entry of an Order Authorizing and Approving Procedures for Rejection of Executory Contracts and Unexpired Leases ("Lease Rejection Motion")**

57.     In the Lease Rejection Motion, the Debtors request authority to establish procedures to reject burdensome leases and executory contracts, in their business judgment and without further order of this Court.  The Rejection Procedures are set forth in detail in the Lease Rejection Motion.

58.     The Debtors believe that the Rejection Procedures will streamline their ability to reject burdensome executory Contracts and unexpired Leases that no longer provide a benefit to the Debtors' estates while also providing parties in interest with adequate notice of the rejection of Contracts and Leases and an opportunity to object to such relief within a reasonable time period. Absent the relief requested herein, filing multiple motions for the rejection of each Contract and Lease would result in substantial costs to, and impose administrative burdens on, the Debtors' estates, in addition to the burden such approach would place on the Court's docket and calendar. As such, the proposed Rejection Procedures are appropriate and necessary to limit the costs and administrative burdens that otherwise would be borne by the Debtors' estates.

59.     In light of the foregoing, and for the reasons set forth in the Lease Rejection Motion, I respectfully submit that the Lease Rejection Motion should be granted.

61893/0001-21908209v4